Appeal of REGAL SHOE CO.      Docket No. 784.

> Where one corporation owns the entire capital stock of other corporations, they will be treated as separate legal entities, except only in extraordinary or fraudulent instances.
>
> Where in 1907 one corporation issued its capital stock for the capital stock of other corporations, such capital stock acquired is tangible property by the express provision of section 325 of the Revenue Act of 1918, notwithstanding the assets of such other corporations consist largely of good will and other intangibles.
>
> The subsequent liquidation of such acquired capital stock and merger of such corporations into the taxpayer do not have the effect, in computing invested capital under the Revenue Act of 1918, of transferring intangible corporate assets to the taxpayer for its stock already issued.

Submitted March 5, 1925; decided March 25, 1925.

*D. A. Embury, Esq.*, for the taxpayer.

*Arthur H. Fast, Esq.*, for the Commissioner.

Before STERNHAGEN, TRAMMELL, and TRUSSELL.

This appeal from a determination of a deficiency in income and profits taxes for the calendar year 1919 exceeding $10,000 is presented upon an agreed statement of facts. It involves the question whether the original issue by the taxpayer of its stock in exchange for stock of its predecessor corporations and the subsequent liquidation of such corporations whereby the taxpayer received tangible and intangible assets, results in the inclusion in invested capital of the taxpayer of the full value of the stock of its predecessors treated as tangible property or of the value of the corporate assets limited by the statutory percentage limitation applicable to intangibles.

### FINDINGS OF FACT.

The taxpayer is a Maine corporation organized on January 17, 1907. Out of an authorized capital stock of $5,000,000, preferred and common, it originally issued $2,500,000 of common and $1,000,000 of preferred. The business of the taxpayer had been built up since 1893 and had passed through several stages of copartnership and corporate reorganization. At the time the taxpayer was organized there were in existence three corporations (hereafter called the three predecessor corporations), as follows: (1) Regal Shoe Co., a New York corporation having assets of $1,000 and outstanding capital stock of $1,000; (2) Regal Shoe Co., a corporation of Massachusetts, having corporate assets of $1,000 and outstanding capital stock in the same amount; (3) Regal Shoe Co., Inc., a New York corporation having $1,000,000 of outstanding capital stock, common and preferred. The corporate assets of these three predecessor corporations and the actual cash value of their entire outstanding capital stock was $3,500,000.

When the taxpayer was organized on January 17, 1907, it issued $1,000 of common stock to its individual incorporators for $1,000 in cash. The following day it issued common stock of $2,499,000 and preferred stock of $1,000,000 in exchange for the entire outstanding capital stock of the three predecessor corporations. This transaction was the result of an offer formally made by the Corporate Organization & Audit Co. to cause the stock of the three predecessor corporations to be transferred to the taxpayer in exchange for the issuance of $2,499,000 of its common and $1,000,000 of its preferred capital stock.

There is not upon the corporate records of the taxpayer of January 17 or 18, 1907, either in its books of account or its directors' or stockholders' minutes, any mention of the corporate assets of the three predecessor corporations. The opening journal entries show capital stock of $1,000, issued for cash of $1,000 on January 17, and the following on January 18:

| | | |
|---|---|---|
| Investments in other Companies | $3,499,000.00 | |
| To capital stock—Preferred | | $1,000,000.00 |
| To capital stock—Common | | 2,499,000.00 |

For 10,000 Shares of the Preferred Stock and 24,990 Shares of the Common Stock issued this day in payment for 10,000 Shares of the Capital Stock of Regal Shoe Company, Inc. (a New York Corporation), $1,000. of the Stock of Regal Shoe Company (a Massachusetts Corporation) and $1,000. of the Stock of Regal Shoe Company (a New York Corporation) being the entire Capital Stock of the above-named companies, in accordance with resolution of the Board of Directors, passed at a Special Meeting held this day.

On January 31, 1907, Regal Shoe Co., Inc., and Regal Shoe Co., a New York corporation, were merged with the taxpayer and the taxpayer acquired all of their assets and surrendered and canceled all of the capital stock of such corporations.

The minutes of a special meeting of the directors of the taxpayer held January 31, 1907, contained the following recitals to the resolution authorizing the merger and the transfer of assets:

Whereas, this company owns the entire capital stock of Regal Shoe Company, Inc., a New York corporation, having acquired the same with the intent of taking over the assets, assuming the liabilities and carrying on the business of said Regal Shoe Company, Inc.; and

Whereas, for the purpose of taking over such assets and carrying on such business, it is desirable that all of such assets should be transferred to this company by instruments duly authorized, executed and delivered, and, when required by law in order to perfect title, filed and recorded.

The bill of sale of the assets of the Regal Shoe Co., Inc., to the taxpayer is dated January 31, 1907, and contains the following recitals:

Whereas, the entire capital stock of Regal Shoe Company, Inc., a corporation organized and existing under and by virtue of the laws of the State of New York, party of the first part, is owned and controlled by and stands in the name of Regal Shoe Company, a corporation organized and existing under and by virtue of the laws of the State of Maine, party of the second part; and

Whereas, it is the intent of the parties hereto that all of the assets and business of the party of the first part shall be transferred to and its liabilities assumed by the party of the second part, and that the party of the first part shall retire definitely and finally from the transaction of business and tha the party of the second part shall thereafter carry on the business formerly transacted by the party of the first part.

At the time of the merger, the assets of the two predecessor New York corporations were worth not less than $1,000,000 for the tan-

gible assets and $2,499,000 for the intangible assets, including good will. The Massachusetts predecessor was dissolved by legislative enactment in 1922.

The stock of the three predecessor corporations prior to the incorporation of the taxpayer, and the stock of the taxpayer after its incorporation and the merger of January 31, 1907, was owned and controlled by the same persons in substantially the same proportions.

In computing its invested capital, as shown by its original income and profits-tax return for the calendar year 1919, the taxpayer regarded its original capital stock of $3,500,000 as having been entirely issued for tangible property consisting of $1,000 cash and $3,499,000 capital stock of the three predecessor corporations. The Commissioner determined a deficiency by reducing the invested capital by $1,367,550, upon the theory that the original capital stock was issued for the corporate assets of the three predecessor corporations consisting of intangibles in the amount of $2,499,000, which intangibles by section 326 (a) (4) of the Revenue Act of 1918 could not be included in invested capital in excess of 25 per cent of the capital stock outstanding on March 3, 1917.

### DECISION.

The deficiency determined by the Commissioner is disallowed.

### OPINION.

STERNHAGEN: Is the taxpayer's invested capital to be computed under section 326 of the Revenue Act of 1918 upon the theory that $3,499,000 par value of its original capital stock was issued on January 18, 1907, in payment for tangible property consisting of capital stock of the three predecessor corporations the value of which is conceded to be no less than the par value of the taxpayer's stock then issued; or upon the theory that the taxpayer's stock was issued for the corporate assets of the three predecessor corporations, which assets concededly included intangibles having a value of $2,499,000?

The facts are not in dispute. On January 18, when the stock of the taxpayer was originally issued, the property paid in therefor consisted of the capital stock of the other corporations. The transaction was with the Corporate Organization & Audit Co., a perfunctory intermediary which had formally offered to deliver the stock of the three corporations to the taxpayer in exchange for its newly issued capital stock. Nothing was said about the corporate assets and the transaction contemplated was an issuance of stock for stock. Section 325 of the statute expressly defines tangible property to include stocks, and in its definition of intangible property it excludes stocks. When, therefore, stocks were bona fide paid in on January 18, 1907, for stock of the taxpayer, they must be regarded, in accordance with the statutory definition, as tangible property bona fide paid in for stock or shares within the express language of section 326 (a) (2). The statute in this respect is clear and unambiguous and there is no room for construction to turn the tangible property consisting of the stocks into intangible property which lies behind the stock.

This definition by Congress, treating stocks as tangible property independent of the corporate assets which they represent, was no violent departure from the usual commercial treatment of stocks. This was recognized by the Supreme Court in *DeGanay* v. *Lederer*, 250 U. S. 376, in which Mr. Justice Day said:

A learned argument is made to the effect that the stock certificates, bonds and mortgages are not property, that they are but evidences of the ownership of interests which are property; that the property, in a legal sense, represented by the securities, would exist if the physical evidences thereof were destroyed. But we are of opinion that these refinements are not decisive of the congressional intent in using the term "property" in this statute. Unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them. To the general understanding and with the common meaning usually attached to such descriptive terms, bonds, mortgages, and certificates of stock are regarded as property. By state and federal statutes they are often treated as property, not as mere evidences of the interest which they represent.

It is now too late to say that the stock received was not property but that it was merely the indicia of ownership of the corporate property, and that hence what was paid in for the taxpayer's stock on January 18, 1907, was the aggregate of the corporate assets, tangible and intangible. Congress has in several respects throughout the revenue acts made it clear that the ownership of capital stock is to be treated as direct ownership of the stock and not indirect ownership of the corporate assets. Were this not so a liquidation distribution of such corporate assets among the stockholders could not result in gain or loss as it has been uniformly treated under the Revenue Act of 1918 and earlier acts. The decisions in *United States* v. *Phellis*, 257 U. S. 156, and in *Cullinan* v. *Walker*, 262 U. S. 134, are founded upon the doctrine that stock and corporate assets are not identical. It is upon the same principle that this Board decided *Huffman's Appeal*, 1 B. T. A. 52, *Greenwood's Appeal*, 1 B. T. A. 291, and *Buchmiller's Appeal*, 1 B. T. A. 380. We need not dwell upon the well recognized distinction between a corporation and its stockholders, nor repeat what so frequently has been said to the effect that the ownership by a corporation is not the ownership of its stockholders, and that the rights and liabilities of the former are separate from those of the latter. A corporation is not a mere form; it is a substantial legal being whose existence, rights and obligations are matters of substance, the recognition of which has permeated the entire economic existence of the Nation, and neither the Government nor the taxpayer will be heard in a bona fide case, except in extraordinary circumstances, to say that it is a mere fiction to be lightly disregarded. *Cannon Mfg. Co.* v. *Cudahy Packing Co.*, 267 U. S. 333.

It is true that, with the complete ownership of the stock of the three predecessor corporations, the taxpayer had an undisputed right to control the corporate assets, but the fact nevertheless remains that in contemplation of law this was an inchoate ownership only and could be exercised only by properly voting the stock and in all other respects keeping the property subject to the obligations of the corporations by which it was owned. It might, of course, so long as it was the sole owner of the capital stock, have liquidated the corporation and thus come into possession and direct ownership

of the assets as it later did; but the fact remains that it did not do so. We said in *Harkness' Appeal*, 1 B. T. A. 127, 130:

It seems to us to be fundamentally unsound to determine income tax liability by what might have taken place rather than what actually occurred. Even though the practical effect may be the same in either case, the resulting tax liability may be quite different.

This is equally true now in favor of this taxpayer as then in favor of the Government.

Our attention is called to the subsequent action of the taxpayer 13 days after the acquisition of the stock, whereby it merged or liquidated the corporations and thus became the direct owner of the intangible property, and to the statement in the minutes that the capital stock then being liquidated had theretofore been acquired " with the intent of taking over the assets, assuming the liabilities, and carrying on the business of said Regal Shoe Co., Inc." It is said that the acquisition of the stock was merely a step in the acquisition of the assets. and from this it is argued that the intermediate step should be disregarded and the transaction looked at as a whole as an issuance of stock for assets.

It is undoubtedly true, as appears from the resolution of January 31, 1907, that the taxpayer at all times intended to acquire the business and assets of the three predecessor corporations, but the fact is that before it acquired these assets it had acquired the stock which the statute characterizes as tangible property, and the assets were acquired not for the stock of the taxpayer company but in liquidation of the stock of the other three corporations which it held. The one transaction was just as important and legally real as the other. During a 13-day period the ownership of the stock and of the assets was in different legal hands, and the practical and legal incidents of such ownership were different. *United States* v. *Phellis*, 257 U. S. 156. This is clear from the fact that at the time of the liquidation the assets received were worth more than the price previously paid for the stock. If the provisions of the 1918 Act had been in effect in 1907, no one would dispute the right of the Government to impose a tax upon the gain represented by the difference between the price paid and the amount received in liquidation, namely, the increase in actual value of the assets received in liquidation over the actual value of the stocks at the time the taxpayer acquired them for its own stock; and this would be true irrespective of the length of time which elapsed between acquisition of the stock and the subsequent liquidation thereof and receipt of the assets.

We must, therefore, hold that the subsequent expression of original intent can not convert the fact of stock issued for stock into a transaction of stock issued for tangible and intangible corporate assets. We must give heed to the statement of the Supreme Court in *United States* v. *Phellis*, 257 U. S. 156, that " in such matters, what was done, rather than the design and purpose of the participants, should be the test." In *Bickley's Appeal*, 1 B. T. A. 544, which is cited in support of the view that the acquisition of stock on January 18 was not a complete transaction, this Board considered all of the facts and decided the appeal upon what was done rather than upon what was said to be done. The assets in that case were said to be transferred to the individuals; in fact they were not transferred and did not become the property of the taxpayer in law or in fact, and hence that decision is not authority here.

That the Board will look behind the outward appearance of a situation and be guided by its substantial nature is apparent from the decisions in *Bradley's Appeal*, 1 B. T. A. 111, *Ames' Appeal*, 1 B. T. A. 63, and *Mitchel's Appeal*, 1 B. T. A. 143; and, if the Board should be asked to countenance a tax evasion accomplished through the adoption of forms amounting to a subterfuge, it will have no hesitation in refusing to do so. Here there is no such situation. The transactions in question took place before an income tax could constitutionally be imposed and an excess-profits tax involving invested capital was not remotely contemplated. There is no suggestion of a lack of good faith.

Reference is made by the parties to article 868 of Regulations 45, which has to do with the consolidated invested capital of corporations affiliated within the meaning of the Revenue Act of 1918. There is here, however, no question of affiliation or consolidated returns, and we do not, therefore, regard this article as material. It would be obviously improper for us to discuss that article in a case to which it is not applicable.

We hold, therefore, that on January 17 and 18, 1907, there was $3,500,000 of cash and "actual cash value of tangible property other than cash bona fide paid in for stock or shares" of the taxpayer and that this amount is therefore properly to be included in the taxpayer's invested capital.

TRAMMELL took no part in the consideration or decision of this appeal.